ABRAXAS GROUP, INC., Plaintiff,

v.

GUARANTY NATIONAL INSURANCE
COMPANY, Defendant.

Civ. A. No. 86–93.

United States District Court,
W.D. Pennsylvania.

Oct. 31, 1986.

Louis J. Krzemien, Jr., Pittsburgh, Pa.,
for plaintiff.

Robert W. Deer, Pittsburgh, Pa., for defendant.

OPINION

GERALD J. WEBER, District Judge.

This is a diversity case alleging breach of an insurance contract. Relevant facts depict defendant, Guaranty National Insurance Company, as the insurer of plaintiff's facilities located at Blue Jay Village, Marionville, Pennsylvania for the period commencing April 1, 1984 and expiring April 1, 1985. Fires of unknown origin occurred totally destroying the building known as "Tiger Dorm" on January 16, 1985 and the building known as "Mohammad Dorm" on February 11, 1985. Plaintiff submitted timely claims of both fires totalling $237,-345.36. Defendant paid $181,206, and denied any remaining amount was due. Plaintiff sued seeking the outstanding amount of $56,139.36.

Following a period of discovery, defendant Guaranty National Insurance filed a motion for summary judgment. There is no dispute that defendant issued an insurance policy to plaintiff and that the policy covers the two buildings which were destroyed by fire in two separate incidents. Defendant urges the court to find that the policy is "scheduled" and that it specifically sets forth amounts of agreed values for each independently identified structure.

Under this interpretation of the insurance contract, defendant would have paid all amounts due and owing under the contract and would be entitled to summary judgment as a matter of law.

Plaintiff has filed its Reply and Cross Motion for Summary Judgment along with evidentiary material and brief, arguing that the policy in question is a "blanket" policy, providing a gross amount of insurance in the amount of $3,709,267. If plaintiff's interpretation of the contract is correct, then plaintiff is entitled to judgment as a matter of law for the outstanding amount of $56,139.36.

*Province of the Court*

■ Federal rather than state law must be applied in determining whether, in a contractual dispute, a given issue is to be decided by the trial judge as a matter of law, or, by the jury or judge as fact finder. *Cooper Laboratories, Inc. v. International Surplus Lines,* 802 F.2d 667 (3d Cir. 1986). The Third Circuit has recently emphasized the distinction between "construction" and "interpretation." Construction of a contract is within the province of the court. Construction is the process by which legal consequences are made to follow from the terms of the contract and its more or less immediate context, and from a legal policy or policies that are applicable to the situation. *Ram Construction Co. Inc. v. American States Insurance Co.,* 749 F.2d 1049 (3d Cir.1984). Interpretation of a contract is a factual matter requiring an inquiry into what the parties intended. *Cooper Laboratories,* at p. 671. When the agreement is in writing, ambiguous terms are interpreted by the jury, unambiguous ones by the court. *Ram Construction Co.,* 749 F.2d at 1052. Both parties urge us to accept that the terms of the contract are unambiguous, and that their respective interpretation is the one the parties intended. Since we believe that the terms of the contract are unambiguous, we find the interpretation of this contract to be a matter that the court appropriately should decide.

*Erie County v. American States Ins. Co.,* 573 F.Supp. 479 (W.D.Pa.1983).

*Applicable Standard*

■ In diversity cases, state substantive law controls the interpretation of the contract. *Cooper Laboratories,* at p. 672. It is the court's duty to ascertain the intent of the parties as manifested in the language of the agreement. *Mohn v. American Casualty Co. of Reading,* 458 Pa. 576, 326 A.2d 346 (1974). Moreover, under Pennsylvania law, a court should read policy provisions to avoid ambiguities if possible, *Pennsylvania Manufacturers' Asso. Insurance Co. v. Aetna Casualty & Surety Insurance Company,* 426 Pa. 453, 233 A.2d 548 (1967), according to the plain and ordinary meaning of the language used. *St. Paul Fire and Marine Insurance Co. v. United States Fire Insurance Co.,* 655 F.2d 521 (3d Cir.1981) (citing Pennsylvania law). In interpreting the various clauses of an insurance contract, the court must give effect to all of the various provisions reading the policy in its entirety. *Monti v. Rockwood Ins. Co.,* 303 Pa.Super. 473, 450 A.2d 24 (Pa.Super.1982).

*Nature of Policy*

Though the parties differ over whether the policy at issue is a "specific" or "blanket" policy, there is no dispute over the definitions of those terms.

■ A *blanket,* compound or floater policy of insurance is written upon a risk as a whole, embracing whatever articles or items are included therein.

[Blanket insurance] is one that invariably covers and attaches to every item of property described therein. If the loss of one item exhausts the whole amount of the policy, the entire insurance must be paid, and there can be no apportionment. Another definition is that a compound, or blanket, policy is one which insures property collectively without providing in the event of a loss for a distribution of insurance to each item.

*Reliance Insurance Co. v. Orleans Parish School Bd.*, 322 F.2d 803, 806 (5th Cir.1963) (citation omitted).

A *specific* policy is one which allocates the amount of the risk in stated values upon the several items embraced in the coverage, or covers property at a designated location for a stated amount, or insures against a specific peril. 6 *Appleman Ins. L. P.* § 3912, page 481 and 482. A "scheduled" policy of insurance "separately schedules different items of property" ... "each separately treated item of property is in effect covered by separate contracts of insurance and the amount recoverable with respect to a loss effecting such property is determined independently of the other items of property." "Scheduled" policies are often referred to as *"specific"* insurance policies.

Defendant argues that the policy is a "scheduled" policy which sets forth amounts of agreed values for each independently identified structure. In support of this argument, defendant refers to the following wording in the policy:

1. On page 1 of the policy under the caption "Description and Location of Property Covered," the words "See Schedule Attached" are typed in.

2. The "schedule attached" is Form CF1210 (see Defendant's Ex. A., p. 9) entitled "Agreed Amount Endorsement" which individually lists the name and location of 10 (ten) covered properties.

3. On Form CF1210 is a column entitled "Amount Applicable In Paragraph A Above." In that column, just below the figure "$3,709,267," are typed the words "per schedule on file with the company."

4. At the bottom of Form CF1210 is an asterisk and some printed wording regarding "specific" versus "blanket" coverage.

Defendant argues that the first three references are to a "schedule" of values showing that the parties intended a "scheduled" or "specific" policy. Defendant further argues that the printed wording at the bottom of Form CF1210 (Defendant's Ex.

A, p. 9) suggests that "if this were a scheduled policy then it must be written at a rate no less than 90% of the actual cash value of each item in the schedule. On the other hand, if this were a "blanket" policy the insurance must be written at 100% of the actual cash value." (Defendant's Brief, unnumbered p. 7.) Defendant then argues that the court should refer to page 1 of its copy of the policy that contains handwritten "90%." From this, the court is to conclude that the coverage is provided at the 90% rate and therefore "specific."

We see no merit in defendant's arguments and believe that we would have to torture the plain meaning of the policy wording and ignore its clear meaning in order to arrive at the interpretation defendant urges.

Plaintiff has supported its position with the arguments on the wording of the policy and the following evidentiary materials.

1. Affidavit of Stephen Horvath, an employee of Coordinated Benefits, who acted as broker for the insurance policy. Horvath indicates that the insurance policy he brokered for Abraxas was "blanket" insurance, providing coverage for any loss up to $3,709,267. Horvath also submits a copy of the policy issued to Abraxas, noting that plaintiff's copy contained no handwritten "90%" on page 1 (to which defendant has made reference) nor does it contain any individual listing of values (which defendant argues has been incorporated by reference into the policy). Horvath further states that the "statement of values" or individual listing was submitted to the underwriters for purposes of evaluating the cost of the blanket policy and was not a part of the policy.

2. Affidavit of Emmett J. Vaughan, Ph.D., Partington Professor of Insurance at the University of Iowa, who examined the policy in question and offered an expert opinion that the policy is a "blanket" policy, and also provided articles regarding blanket and specific coverage.

3. Documents produced by Guaranty tending to show that the policy requested of and insured by defendant Guaranty was a "blanket" policy, and that Guaranty intended to issue a "blanket" policy.

We do not find it necessary, however, to rely on expert opinions or extraneous materials to make our determination, and we will disregard these evidentiary materials. All that is necessary is to read the policy. Particularly persuasive is the fact that the amount of insurance listed on page one is $3,709,267, and this is listed without qualification or reference to any separately valued items. Further, Form 0421 entitled "Replacement Cost Endorsement For Mixed Blanket Items" indicates "This endorsement applies only to items of insurance which provide blanket coverage on specifically designated property on a replacement cost basis and on all other property under that item on an actual cash value basis." This endorsement, by its own terms, is used only for "blanket" coverage. Also the "Agreed Amount Schedule" separately lists the properties but lumps the amount applicable (for which the company would be liable) as $3,709,267. The words "per schedule on file with company" does not change the clear meaning of this figure. Furthermore, even the "schedule of values," which arguably was never a part of the policy, arrives at a "Blanket Agreed Amount." We believe that this "schedule of values" was clearly used to evaluate the cost of the overall blanket coverage issued. Moreover, Guaranty charged a premium based on a flat rate of $.41 per $100 of insurance on the total amount of coverage or $3,709,267, rather than applying individual rates to each item of property insured. In considering the policy as a whole, we are inevitably led to the conclusion from the policy's plain meaning that what Guaranty intended to and did issue was a "blanket" policy of insurance. Plaintiff is entitled to summary judgment as a matter of law. An appropriate order will issue.